LAMKIN v. PALMER.

(Supreme Court, Appellate Division, Fourth Department.    December 18, 1897.)

1. CONTRACTS—EVIDENCE—ADMISSIBILITY.
     In an action on an agreement to pay the debt of a corporation to a stockholder in consideration of the latter's consent to a sale of the corporate assets, a prior agreement by defendant to assume the debts of the company in consideration of a transfer of stock to him, which also made him a director, was admissible to show his relation to the corporation and his interest therein.

2. APPEAL—VERDICT ON CONFLICTING EVIDENCE.
     Where plaintiff's testimony that defendant agreed to pay his claim against a corporation was contradicted, but was corroborated by others and by circumstances, a verdict for plaintiff is conclusive.

3. PROMISE TO PAY THE DEBT OF ANOTHER—CONSIDERATION—ORIGINAL UNDERTAKING.
     Consent of a stockholder to a sale of the corporate assets is sufficient consideration to support, as an original undertaking, a promise by a director to pay a debt of the corporation to the stockholder.

Appeal from trial term.

Action by Harry H. Lamkin against Joseph W. Palmer.    From a judgment entered on a verdict for plaintiff, and an order denying a motion for a new trial, made on the minutes, defendant appeals.    Affirmed.

Verdict for the plaintiff at a trial term in Erie county, in May, 1896, for $2,440.50.    A motion for a new trial was made upon the minutes, and denied. Defendant appeals from the judgment entered upon the verdict, and from the order denying his motion for a new trial, made upon the minutes.    Plaintiff, in his complaint, alleged that he was the owner and holder of 39 shares of the capital stock of the M. S. Robinson Musee Company, a corporation engaged in the theatrical business in the cities of Buffalo and Rochester, incorporated under the laws of the state, and "was also at that time, and thereafter continued to be, individually liable as an indorser or surety upon various promissory notes or other obligations of said Musee Company in the sum of over $5,000"; that the company was conducting two theaters, one in the city of

Buffalo, and one in the city of Rochester; that the one in Buffalo was destroyed by fire in the early part of December, 1893, "and left as the only theater conducted by said company the said Rochester house; that during said month of December, 1893, and the month of January, 1894, the said defendant was constantly urging various other parties interested in said company that said Rochester house should be sold, and assured the plaintiff and others interested therein that he could effect a sale thereof; that, in order to sell said Rochester house, which was the only and sole remaining asset and business of said Musee Theater Company, it was necessary that all of the stockholders of and interested in said company should consent to the sale thereof; that in or about the said month of January, 1894, the said defendant stated to the plaintiff that he (the said defendant) had secured the consent of all the remaining stockholders, except the plaintiff, for a sale of said Rochester house, and that in order to make the sale as he desired, and thereby pay in full the debts of said theater company connected with the management and operation of said Rochester house, it was necessary to obtain the consent of the plaintiff thereto;. that plaintiff thereupon, as he had at divers times before, advised said defendant that he (the said plaintiff) would under no circumstances consent to the sale of said Rochester house at the proposed price, unless the plaintiff were paid the sum of $2,150, which amount of the plaintiff's money had gone into said company, and had been used for the payment of debts and expenses of said theater, and to represent and secure the payment of which the said abovementioned stock had been issued to the plaintiff; that defendant thereupon stated to plaintiff that he (the said defendant) was anxious to make the proposed sale of said Rochester house, and that it was necessary to obtain plaintiff's consent as a stockholder thereto, and said defendant agreed that, if he (the said plaintiff) would sign the written consent to such sale, he (the said defendant) would personally pay to the plaintiff, immediately upon the consummation of the sale of said Rochester house, the said sum of $2,150, and that a sale was then being negotiated with a Mr. Moore, of Detroit, Mich.; that the plaintiff thereupon consented to, and did, sign said consent for the sale of said premises by said defendant, upon the faith of said defendant's agreement to pay said sum of $2,150 to the plaintiff as aforesaid, which said written consent was thereupon delivered by the plaintiff to the defendant, and said defendant did immediately thereafter make a sale of said Rochester house, and received the purchase price thereof; that plaintiff thereafter demanded of the said defendant the payment of said sum of $2,150, and the said defendant has refused and still refuses to pay the same, or any part thereof." The answer of the defendant contains several denials; and it alleges "that the said plaintiff knew that it was necessary for all of the stockholders interested in said company to consent to a sale thereof prior to the time that said plaintiff signed said consent." The answer further "alleges that the agreement referred to in the complaint, if made at all, was made without consideration, and the same, not being in writing, was void by the statute of frauds of the state of New York."

Argued before HARDIN, P. J., and FOLLETT, ADAMS, GREEN,. and WARD, JJ.

Hubbell & McGuire, for appellant.

Frank Brundage, for respondent.

HARDIN, P. J. Upon the trial it was proven that March 1, 1892, a. corporation known as the M. S. Robinson Musee Company was formed, and that it thereafter carried on business at Buffalo and Rochester, and the plaintiff became a manager thereof. In April, 1892, 10 shares of the capital stock of the company were transferred to the plaintiff, who became the owner thereof. Evidence was given tending to show that prior to July 11, 1893, the plaintiff loaned to M. S. Robinson, who was the president of the corporation, $2,150, which went into the corporation, and was used for its benefit; and in July, 1893, there were issued, by the company to the plaintiff, 14 shares of the preferred and

15 shares of the common stock of the corporation, for the money which was so loaned by the plaintiff and used by the corporation; and evidence was given tending to show that the money had never been repaid. In July, 1893, the company was indebted to divers persons to the extent of $37,000. On the 2d day of August, 1893, the defendant entered into a written agreement with certain of the stockholders of the corporation, wherein it was recited that the debts and liabilities incurred by the company in the management of the Rochester theater amounted to about the sum of $14,000; and in that agreement he assumed and agreed to pay, "as between the parties hereto, the indebtedness of the M. S. Robinson Musee Company at Rochester"; and D. E. Morgan Son & Allen and others of the parties to that agreement agreed with him to "sell, assign, transfer, and set over to the party of the third part [the defendant] three hundred and twelve shares of the capital stock of said company, of which one-half thereof shall be preferred and one-half thereof common stock." That agreement also provided that the directors in the company should be increased to five, and that the defendant should become one of the directors. When that agreement was offered in evidence, the defendant objected to the same, and his objections thereto were overruled. We think the agreement was competent, as tending to show the relation of the defendant to the corporation, and the extent of his interest and ownership therein, and that no error was committed in receiving the same in evidence. Apparently, after that agreement was made, the corporation continued to lose money, and in the early part of December, 1893, the Buffalo property owned by the corporation was destroyed by fire, except about $240 thereof. Thereupon the parties in interest became solicitous to sell out the remaining assets of the corporation. The negotiations for the sale did not become effective until in January, 1894. In that month the defendant entered into negotiations with one Moore for the purchase of the property remaining at Rochester, and, with a view of making the purchase, he had an interview with Moore, and also with Wiggins, Moore's agent. Moore evinced a willingness to buy the property provided he could have a transfer direct from the defendant, declining to take a transfer from the corporation. Thereupon the defendant communicated with the parties in interest in Buffalo, and several negotiations were had with a view of having the stockholders consent to a sale of the property by the corporation to the defendant, to the end that he might consummate a sale thereof to Moore. At that time the defendant was liable as an indorser or otherwise to the extent of some $7,500, and he was also liable, by reason of his agreement made on the 2d of August, to save the other parties harmless from the payment of the indebtedness accrued at Rochester; and apparently he became solicitous to get the Rochester property turned into money, with a view of enabling him to liquidate the indebtedness for which he had become liable. He procured an offer from Mr. Moore to purchase the property for $12,500, and executed an agreement with Moore that, when he had procured the title of the property, he would transfer it to Moore for that price; and to effectuate the purposes of the defendant in acquiring the title, to the end that he might transfer the same to Moore, efforts were made to secure the

consent of the stockholders, and to induce them to sign a written consent to the sale, so as to avoid all question that might be raised in respect thereto.    A written consent was prepared, which contained the following language:

"We, the undersigned, do hereby consent that the M. S. Robinson Musee Company may sell its Rochester theater, and execute a bill of sale thereof, dated January 8th, 1894, and shall include the book accounts due the Rochester house, and the scenery, effects, and properties of the theater, and the lease.    Dated January 8th, 1894."

That instrument was signed by M. S. Robinson, by the defendant and several other stockholders, and, according to the testimony given in behalf of the plaintiff, it was presented by the defendant to the plaintiff to sign.    According to the testimony, the plaintiff, apparently, was unwilling to sign the same until he could receive some promise which should benefit him if he gave the consent.    The plaintiff testified that he had an interview with the defendant in respect to signing the consent in January, 1894.    He says:

"That talk upon the subject of my signing a consent to the sale was in the office of the Musee, at Rochester.    There was not any one present.    He wanted me to sign the stock.    I refused to sign it, and saying that that was all that was left at the Musee, and that I had this money in there, that I had put in from time to time, and had worked hard for, and I couldn't afford to lose it, and he went away.    I positively refused to sign it.    He came back in a day or two, and wanted me to sign it again, and I refused to sign it.    He asked me if I wanted the sheriff to come in and take the place.    I told him I could stand it if he could, as I knew he was on a large amount of paper.    That was the only way I had of getting my money; was not signing that paper until he agreed to pay me.    Before he went away that time, he said, 'If you will sign this paper, I will agree to pay you as soon as the house is sold out of the money that I get from the house.'"

The witness then added, "The other stockholders had signed;" that he saw their names; and he further testified that the defendant produced a paper there, and they had all signed except the plaintiff. He added that, after the statement made to him, he signed the paper. The witness was then interrogated by the court as follows: "Q. What did he tell you he would do if you would sign?    A. He would pay my claim, which was $2,150, out of the money he received for the theater."    The testimony given by Mr. Marcy, Mr. Close, and Mr. Willis Morgan, as well as the facts and circumstances and negotiations revealed by the telegrams and letters passing between the several parties, tends strongly to corroborate the testimony upon the vital question given by the plaintiff.    Upon the other hand, the testimony given by the defendant, as a witness, is in conflict with the testimony given by the plaintiff and his witnesses, and we think a question of fact was presented for the jury to determine; and, the weight of the evidence being in favor of the plaintiff, we should accept the verdict of the jury as final upon the disputed questions of fact.

The defendant consummated the sale of the property to Moore, and received $10,000, besides a note of $2,000, made by M. S. Robinson, which was indorsed by Moore to the defendant, without recourse. There is sufficient evidence to show that, before this action was commenced, the plaintiff made a demand of the defendant that he pay the $2,150, and the defendant refused to pay the same.    This action

was not commenced until July 20, 1895, which was long after the defendant had realized the full fruits of the sale made by him of the property to Moore.

It is contended in behalf of the appellant that the plaintiff did not prove any cause of action.    The plaintiff had an interest in the assets of the corporation.    When he signed the consent, he waived that interest.    "A share of stock may be defined as a right which its owner has in the management, profits, and ultimate assets of the corporation."    Cook, Stock, Stockh. & Corp. Law (2d Ed.) § 5.    We think the consent furnished a sufficient consideration for the agreement made by the defendant, and that the promise of the defendant was an original undertaking, founded upon a new and distinct consideration moving to the defendant, and beneficial to him.    Jones v. Bacon, 72 Hun, 506, 25 N. Y. Supp. 212; affirmed 145 N. Y. 446, 40 N. E. 216; White v. Rintoul, 108 N. Y. 223, 15 N. E. 318; Bank v. Chalmers, 144 N. Y. 432, 39 N. E. 331.

We think the exception to the charge that "there was sufficient consideration in law to uphold the claim if they believe the testimony of the plaintiff" presents no error.    In connection with that exception, there was a request "upon that subject" that "it was not necessary that every stockholder should give his consent, either in writing or orally, in order to enable the trustees to make a valid sale of the property which it conveyed under the bill of sale in question; and, of course, that is the main question over again."    We think the request was so involved, connected with the subject of the consideration, and an avowal that it is the main question over again, to wit, the question of consideration, that the refusal to charge in accordance therewith presents no error.    The parties acted upon the assumption that the consent of all the stockholders was essential to complete the negotiations that were set on foot between the defendant and Moore.    Indeed, the defendant acted upon the assumption that the consent of all the stockholders was necessary, and especially the consent of the plaintiff; and if he made the agreement that, if the plaintiff would consent, he would pay him $2,150, as the jury have found, he became liable to pay him that sum.

We have looked at some other exceptions taken during the progress of the trial, and find none of them which require us to disturb the verdict on the principal question of fact.    We think the verdict should remain.

Judgment and order affirmed, with costs.    All concur.